The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. All right, please be seated. All right, we'll start with our first case, Speech First v. Timothy Sands, and Mr. Hassan, whenever you're ready, we'd be pleased to hear from you. Good morning, Your Honors, and may it please the Court. The question in this case is not whether universities can facilitate conversation about bias or impose reasonable time, place, and manner restrictions on campus activities. They clearly can. The question is whether the two policies the universities adopted here... I'm going to ask you to speak up because we have, fortunately, social distancing, but I want you to speak up. Absolutely, Your Honor. The question is whether the two policies the university has adopted here, the bias-related incidents policy and the informational activities policy, go too far by chilling student speech and restraining expressive activity. They likely do. The university is not using the bias-related incidents policy to facilitate conversations. It has adopted a formal definition of bias-related incidents. It has adopted a formal process that asks students to anonymously report each other to a team of university administrators who open investigations, ask for meetings, threaten referrals to disciplinary authorities, and keep logs of all complaints. The university's own exhibits in the district court state that the purpose of the policy is to, quote, eliminate bias speech. This regime does not facilitate speech. The university is contending with respect to the leafleting that it has tables all over campus and that the approval process is a fairly perfunctory one. I realize that's only one aspect of the policy that you're challenging, but what is your response to the general point that they're making, that tables are widely dispersed and that there's still old-fashioned ways of communicating like billboards and that approval is to have a petition or something at a table is perfunctory, that they're all approved as a matter of course. What's your thought about that? Thank you, Your Honor. Our response would be that there's nothing in the policy that says that. The policy on its face says that you need prior written authorization. If the university, for example... So the question is, do we rely on the policy or the depositions that indicate how the policy works? What's the operative thing here, the policy or the depositions? Your Honor, I would say it would be the policy. In North Carolina, right to life, in your opinion in that case, Your Honor, the court held that post hoc litigation representations are not binding on the court and do not otherwise outweigh a facially restrictive policy on speech. And that's the case here. Was that a preliminary injunction case? I believe it was, Your Honor. I have to double check that, but that's my understanding. I guess what Judge Wilkinson's question is getting at is why shouldn't we just look at the policy that apparently, at least on the face of it, has been applied in practice that suggests that there really isn't anything arbitrary or capricious about it, that there's a process for getting approval, which is generally granted, I think, in every case, and that there essentially is a lottery system, which is restrained simply by the capacity of the university to accommodate the various groups, but there's no content subject matter restriction. Your Honor, respectfully, I do think there is some content subject matter. So, for example, you need prior authorization to distribute literature about informational activities. You don't need that to distribute literature for advertising. For what? I'm sorry? Advertising. Okay. So, for example, if you want to hand out leaflets about the upcoming election, about a ballot measure, you need prior written authorization. If you want to advertise about a Trinity Rush Week event. You just have to talk up. I apologize, Your Honor. Old ears. No, I apologize, Your Honor. Is this better, Your Honor? Yes. Can you pull the microphone closer to you because you're tall? Yeah, sure thing. All right. So, but if you wanted to hand out literature for a Rush Week event, for example, advertising, then you don't need approval at all. So, the difference between those two things are the words written on a piece of paper, which we would believe would make it content-based, Your Honor. I'm sorry, I didn't understand your distinction. One is advertising and one's not. And if you're talking about your beliefs, that's advertising them. I just don't get it. Try me again on that, okay? Certainly. So, the policy requires prior written authorization to distribute literature. Right. That's informational in nature. Say, for example, something about a ballot measure in an upcoming election. But you do not need prior written authorization to distribute literature that is advertising. If that makes sense, Your Honor. So, it's the same handout, but the content is different, and one requires prior written authorization and the other doesn't. But, if I may, back to the bias-related incidence policy. The court, the question... The Fifth Circuit cases, I don't think they did. They had one of these bias committees before them. But my recollection is that the leafleting question that's presented here and the tables and everything, was that an issue in the Fifth and Sixth Circuit cases? Because it seems to me that we're certainly courting a circuit conflict if we uphold the bias committee. But as far as the leafleting question was concerned, was anything comparable presented to those other circuits? No, Your Honor. The speech first case is in Schlissel in the Sixth Circuit, and that is the Fifth. So the conflict would be with respect to the bias committee? That's correct, Your Honor. Is there already a circuit conflict, though? The Seventh Circuit took issue with the factual record in that case. If you look at Judge Brennan's concurrence in that case, he wanted declarations from the students, and that's the record that we provided here. But when you do a one-to-one comparison on the facts and the record between Cartwright in the Eleventh Circuit, Schlissel in the Sixth, and Fendes in the Fifth, all three of those are uniform, that these types of policies objectively chill speech. The holding in the Seventh Circuit was? They found a lack of standing because there was not a strong enough factual record to show that speech was being objectively chilled. And I think that's the argument here, is it not? To a large extent, yes, Your Honor. So there is a split in the circuits already about the argument that is at issue here. Yeah, I think that's probably it. My understanding was that the Seventh Circuit held no standing and that the Fifth and Sixth Circuits held that there was standing. And as I understand it, the argument for standing that you're making is that these are students at the university. They are subject to the policy. And that when we look at injury in fact, the Seventh Circuit said, well, there need to be particularized definitions. But as I understand the Fifth and Sixth Circuits, they were saying, no, that this case law is supported, that self-censorship on these volatile topics is in fact due to the policies and that that qualifies as an injury in fact. The self-censorship is an injury in fact. Is that your argument? Yes, Your Honor. Because the policies, if you take a look at comprehensively what they do, the anonymous reports, they summon students for meetings. You don't necessarily need to wait for the authorities to say, well, what you've just said is out of bounds and the rest. It's a question of the reaction to these sorts of policies being called on the rug by the dean's office and everything is enough to create the policies themselves, create self-censorship under the First Amendment. And that was the argument that persuaded at least a number of several other circuits, the fact that there was indeed standing here. That's correct, Your Honor. That's our position as well. And this court in Cooksey held that in a reinforcement facial challenge, you don't need to wait and risk punishment in order to be able to challenge a policy that facially applies to speech and has an objectively chilling effect. Excuse me about one of our more recent precedents, Abbott. And isn't there language there that a threatened administrative inquiry does not constitute a First Amendment injury? Doesn't that seem to fit exactly this case? So we believe Abbott is distinguishable, Your Honor. I believe you're on that. That's the language. I quoted the language. Yes, yes, yes. That's not distinguishable. Yes, yes. But the court in Abbott did say that the facts that it's holding was limited to the facts of the policy before us. And the facts before us, I think, was the quote that the court used. It also described the situation as a, quote, very unusual First Amendment challenge. And the reason for that is a student was asked permission beforehand to hold an event. The university said, by all means. Yes. After people complained, the university said, well, we weren't physically at the event, so we don't know if it happened as approved. And so they asked for a single meeting to clarify the facts, and they even emphasized that they were not investigating the student. They were in a pre-investigation stage. Here you have an entire apparatus that is affirmatively designed to, quote, eliminate biased speech. The university describes it as reprehensible. They describe biased speech as reprehensible. Well, that's one way of looking at it. I suppose another way of looking at it is that the policy is in place to mediate disputes among students. Is it your position that universities and administrators have no role in mediating disputes among students? Well, certainly universities have to be able to resolve disputes, but it can't be the case that you're trying to facilitate a conversation if you're soliciting anonymous reports. There's no one to have a conversation. There's nothing to mediate if someone's reporting you anonymously for having an unpopular opinion about whether it's immigration or gender identity issues or any of the like. And the university has even referred a student to student conduct from the BRT for an unpopular position about immigration, which is exactly... And what happened then? They ended up not charging, but... No one's ever been charged, right? Well, the disciplinary records are confidential, but there's nothing before us, and part of that is because those records would be confidential and referred... But we know two people have been referred and nothing happened. Based on the university's representations, yes, Your Honor. Are you suggesting that the university has lied to you? No, no, no. That's not at all what I'm trying to say. I'm just trying to say there's nothing in the record before us, and that we learned about those two things from the university's brief. But as the court held in Cartwright in the 11th Circuit, which I might add was a case where the university and the district court described that policy as precisely the same, I think was the term that they used, as the BIRT, after the district court, in that case, held that speech lacked standing. And we would agree that those policies are basically carbon copies of one another. And what the 11th Circuit held in Cartwright was, after reviewing the Supreme Court's decision in Bantam Books, and Akwetey, and other cases, that universities can shill speech without directly prohibiting anything. And that's the situation where we are here. And even in the 7th Circuit, Judge Brennan's concurrence emphasized that process is punishment, is not a platitude. And the other, you know, Killeen and Schlissel also held the same. Thank you, thank you, sir. You had some rebuttal time. Thank you, Your Honor. And we will now hear from Mr. Hurd. Mr. Hurd, I'm going to ask you to speak up, too, because I'm interested to hear what you have to say. Yes, Your Honor. May it please the Court, let me touch briefly on one of the errors that opposing counsel has made in his opening remarks. Mr. Hurd, I'm sorry to interrupt you, but before we get to that, there's a motion pending to dismiss this action entirely based on developments of record and their competing affidavits. Could you talk briefly about that? Because it seems to me that the bottom line here, that there still at least remains one student who has not yet graduated. And although you surmise that he or she may well be gone by the end of December, we really have no way of knowing that. So why doesn't that really end the prudential standing inquiry? Well, Your Honor, we do have a way of knowing that this student is likely to graduate in December. They have said that to this Court in a sworn affidavit. Therefore, it is most likely that by the time this Court finishes its work on this case, that student will be gone. You underestimate the efficiency of the Court. Yeah, we're Speedy Gonzales up here. In any event, Your Honor, if the Court decides to proceed to the merits, Virginia Tech should prevail. In their reply brief, and again this morning, they misquote the record. They say Virginia Tech's stated purpose is to eliminate biased speech. And in their brief, they point to JA369. But that's not what JA369 says. It talks about eliminating acts of bias, not speech. And on the same page, it says this, quote, effective and appropriate response. How can this not be said? It's not just a conduct regulation. It talks about if there's bias, somebody can be reported for biased speech. Excuse me, Mr. Hurd. There's no limitation on saying you can't report someone for just pure speech. And then the policy 5215 talks specifically about the distribution of literature and informational activities. Now, that is speech. It's pure speech. Your Honor, let me address those separately. First, with respect to informational activity, the policy says nothing about giving any discretion to Virginia Tech officials to make any kind of content-based decision. The evidence shows they do not make any content-based decisions. Where in the policy does it draw a line between conduct and speech? Your Honor, the policies are very different. There's the bias response policy and this information activities policy, the leafleting policy, if you will. Now, this morning, opposing counsel has tried to introduce a new argument saying there is a difference in how we treat handing out political flyers versus handing out advertisement. There's no difference. Where is that in the policy? Well, Your Honor, the policy for advertising, and I take him to mean like advertising pizza or something, that is not part of the informational activities policy that they are challenging in this case. That is found in a different part of the policy, JA228, that deals with advertising. Mr. Hurd, I don't see anything in the policy that rules speech off balance. And the whole difficulty, and it's really fundamental here, is that you've got a university, which is supposed to be a place of dialogue for the students who attend it, and it's all channeled into a pre-approval process to the state. In other words, you've got to get the state's permission before you can engage in First Amendment activities. Your Honor, that is not correct. It is correct. That is inconsistent with the record. You have to get permission to reserve a place to pass out leaflets. Right, but let me explain. But not to speak, not to speak. Excuse me, Mr. Hurd. You keep interrupting me. Excuse me. I apologize, Your Honor. This permission, this language is so vague, and you're saying, well, trust us. Trust us. We're going to do it fine. Well, we're told by the Supreme Court that we're not to just turn over the First Amendment to a sort of a trusting process, and the difficulty here is that you've got a policy where there's an unnamed official operating under vague and indefinite policy. Your Honor, if I may, let me focus on the BERT issue, the bias response issue. Excuse me. There are two policies. Yes. And I think it would be helpful for me anyway if you could tell me what policy you are addressing, one at a time. Let me address first the bias response policy. Okay. This Court has said on multiple occasions that in order to have standing, you have to have a credible threat of enforcement. Now, there is no credible threat of enforcement here because our bias policy does not prohibit anything. Our bias policy team cannot discipline anyone. That's what Judge Urbanski found, and they have not challenged that. What they have said is, oh, well, BERT can refer a case to law enforcement or the Student Conduct Office, and that... Can anyone do that? Certainly. Certainly they can. So that would mean if that gives you standing, you have standing against the world, I guess. Well, I think that's probably true, Your Honor. But here's the key point. In order to have a threat of enforcement, you first have to have a rule to enforce. And we have no rules that prohibit protected speech. And the power to refer cannot chill speech here because there is no basis to refer protected speech here. Mr. Hurd, do you think that there needs to be a power to enforce in order to satisfy, to support a First Amendment violation simply for chilling speech? Well, this Court has found that in order to have chilling, you have to have a credible threat of enforcement. The Court has said that in Abbott and in some other cases. So it's not that chilling is a freestanding thing we look at and do some kind of psychological analysis. That's what they may have done in the Schlissel case in Sixth Circuit, but that's wrong. You have to have a credible threat of enforcement. There is no credible threat here because there are no rules to violate for protected speech. Is that a merits determination or a standing determination? Because we're here on standing, right? It is a standing determination. In Abbott, this Court said... Abbott wasn't a standing case. It was an adjudication on the merits. But the Court also said, a credible threat of enforcement is critical. Without one, a punitive plaintiff can establish neither a realistic threat of legal sanction if he engages in speech in question, nor an objectively good reason for refraining from speaking and self-censoring instead. That was a comment about standing in the context of Abbott, and the Court has said it in other cases as well. Now, they realize there are no rules that prohibit protected speech. They realize, whether they admit it or not, that Burke can only refer to law enforcement or student conduct if there's a violation of a rule or a law. They mention two mistakes that were made. How can this, Mr. Hurd, how can this possibly not have a chilling effect when something you say can give rise to an anonymous report and an anonymous accusation to this committee, and then you're going to get a letter from the dean of students or somebody in the dean of students' office calling you on the carpet and saying, Explain yourself. How can that not be a chilling effect? You have to consider it from the standpoint of students who know if they speak out on a controversial subject, be it transgender issues or Black Lives Matter issues or illegal immigration issues, they're going to be called, they're going to be reported by somebody, they're going to be reported anonymously, and you're going to receive an invitation, or invitation is too mild a word, you're going to receive a letter from the dean of students saying, Come before this committee and explain yourself. And then further, there is going to be a report in the dean's files to be referred as needed to a student council or to some disciplinary body. And this seems to me, if this isn't a chilling, this whole apparatus, if this whole apparatus doesn't exert a chilling effect, I'm hard-pressed to know what does. You know, with due respect, the record is much different than that. It is very rarely, very rarely, does the dean invite someone to come to a meeting, and those meetings are voluntary. Now, they say, Well, nobody would regard the meeting as voluntary, but let's look at what happened in the killing case, the Seventh Circuit. That court found that when students were invited to a meeting by the Illinois Vice Response Team, a majority either did not respond or declined to meet. That's at 968 Fed 3rd 633. So the average student does not regard these meetings as mandatory. And if a mandatory meeting that was going to talk about, Well, did you violate some policy? If that mandatory meeting is not unduly chilling, then now there is a voluntary meeting where there cannot be a referral unless there is a reason to believe you violated the law or some rule. They have not pointed to any rule prohibiting speech in this whole thing. Now, let me give you an example, Your Honor. It's your burden to show that it's not their burden to show a rule prohibiting speech. It's your burden to show that you have a very emphatic policy permitting speech. Your Honor, we have such a rule. It appears on the first page of our brief that we view every complaint through the lens of the First Amendment. Offensive speech or not. But where's the policy? The policy is there, Your Honor. It's cited in the first page of our brief. That is the policy. We view every complaint through the lens of the First Amendment. That's why so few ever wind up resulting in an invitation. Let me give you, Your Honor, an example. You know, that is simply a plea from a state bureaucracy to say, trust us, we're going to do well. But the point is the plain language of the policy is what governs here. Let me give you a child evangelism case to make that clear. What this whole thing and what your argument is saying is that we're going to be good people. We're going to administer this in a fair-minded way and everything. But when I look at the combination of a prior restraint coupled with the vague language and the bureaucratic discretion that resides in the administration of it, it's a combination of a lot of different First Amendment red flags. Jonathan, if I may, the child evangelism case they have cited, not in the context of the bias response policy, but in the context of the information activities policy, they pointed out that in child evangelism, the policy of that school board was unconstitutional because they would review in advance your flyer to see if it could proceed or not. We don't review anyone's leaflet. And this is the information activities policy again. We don't review leaflets in advance to see if we like them or not. It is a first-come, first-served approach, a reservation system only. That's what the judge found. Judge Obransky found. Before, if I could just ask you this question, it is like child evangelism to the extent that somebody who wants to distribute these must come to you, you, the ruling body, and get approval before this. So it's a prior restraint of some sort, isn't it? Well, so in child evangelism, the school itself was doing the distribution. I'm very familiar with child evangelism. Yes, you are. I understand. So is it a prior restraint to reserve a table in advance? Well, yes, it is. But a prior restraint is lawful if it is a reasonable time, place, and manner requirement. And this one is to say, look, we've got 800 organizations. We've got 38,000 people. We're trying to figure out how to administer this thing in a reasonable way. And so, yes, you come in and say, hey, I would like to have a table at the end of the drill field next Tuesday. You can make a reasonable policy out of, you say, oh, there's so much congestion and this and that. You can make a reasonable policy out of time, place, and manner restrictions, which says you can't distribute literature in the hallways. You can't distribute literature at the doorway to the hallways. So there are plenty of ways in which you can administer this. Yes, that's correct. This policy. And what bothers me is I think back to the founding of this country and the importance that leafleting and petitions, which are explicitly protected in the Constitution, did the founders of this country and the people that wrote our Constitution envision a system where people had to get preapproval from the state before they could say anything controversial? And that is not our policy. Mr. Hurd, please. This is fundamentally at odds with the principles that this country would produce, which was prior approval for speech subject to loose discretionary standards administered by unnamed bureaucrats subject to anonymous reporting of one student or another. Is this what a university is supposed to stand for? Is this? I don't get it. Well, you know, if I may, obviously if the state of Virginia required prior approval of the content of leaflets before passing them out, that would be unconstitutional. If you said you can't pass out leaflets on the street of Richmond without prior approval, that would be unconstitutional because that is a traditional public forum. The university is not a traditional public forum. Now, there may be other ways to have a reasonable time, place, and manner of restriction on passing out leaflets. And if you or I or on the board... It's not a traditional public forum in the sense of a sidewalk or a street or a park, I grant you. But it is a public forum for the students who are part of the intellectual life at the university, which one would hope would nourish them. And it is a designated public forum for not just the public at large but for the students. And the Supreme Court has repeatedly said that the university for the students themselves is supposed to be a place where speech, values, and dialogue are honored and not chilled and subject to preapproval by university authorities. Well, Jonah, again, that is not what this record is. We do not look at flyers in advance to approve their content. The policy does not give us that authority. And if you thought the policy was ambiguous on that question, then you should defer to practice and you should defer to the presumption that officials will discharge their duties correctly. Let me give you an example, Your Honor, of something that would merit an invitation. What about the solo speaker? You have to be a member of a student organization in order to get preapproval. Now suppose a single individual wants to leaflet at a crosswalk. Justice Kennedy made the specific point that the First Amendment is not meant simply for people who combine in groups under an RSO. It's meant for the single person who may have an unpopular point of view, but that person is entitled to be protected in leafleting or whatever at a crosswalk. You don't have to have everything go through a preapproved table. Your Honor, the Martinez case would dictate a different result. But let me, if I may, give you an example of something that would merit an invitation to come to a meeting. In this Court's decision in the Iota Zai case in 1993, the Court dealt with a college fraternity that held an ugly woman contest with one guy dressed in blackface. The Court said that was protected speech. And if that happened at Virginia Tech, we would treat it as protected speech. But we would probably want someone, perhaps the Office of Greek Affairs, to invite those students to come in for a conversation about why that speech is wrong. But according to Speech First, we could not even make that invitation. Even the possibility of making that invitation would violate the Constitution in their view. And that cannot be right. We are an educational institution, and we would not be doing our job if we did not try to show these students why that kind of speech was a problem. And that is part of our academic mission. Thank you, Mr. Hurd. I'm going to ask each of my co-panelists if they have any questions, in which case we'll give you some extra time.  We have no further questions. Thank you. Thank you, Your Honor. We ask that judgment below be affirmed. Mr. Hassett, you had some rebuttal time. Thank you very much, Your Honor. I'd like to briefly address a few points about the BIRT and then a few points about the Informational Activities Policy. One, my friend over here has emphasized that they don't formally punish students from the BIRT, but never addressed the case law in the Second Circuit and the Supreme Court that we cited in our brief, showing that formal prohibitions are not required to chill speech. And that's exactly what the Bias Response Team does. So, Mr. Hassett, do you think that our Abbott decision, that that was wrongly decided? Because that seemed to suggest support Mr. Hurd's position that there has to be a credible threat of enforcement. I think Abbott is distinguishable, Your Honor, for the reasons that I expressed during my opening. You certainly did distinguish it, but I don't know that you distinguish it in a way that really makes a difference to this case. I think the difference between the two is, in Abbott it was the normal disciplinary process and they had basically a fact-finding single meeting, pre-investigatory meeting. Whereas here, if a student says something about anything remotely controversial, including in class, they could be brought in for a meeting and I think that includes the Director of Student Conduct. And as the 11th Circuit pointed out in Cartwright, and that's 32F4 at 1124 Note 5, the average student would no more think that that kind of invitation was voluntary than a teenager would if their parent said, please clean your room, or can you please clean your room. That was the exact example that the 11th Circuit used in that case. And third, I would emphasize that if we just changed the actor from the university to the city, and the type of speech from biased speech to patriotic speech, no one would think that the city of Blacksburg could have a patriotism response team where they summon people in for meetings for saying anti-American speech. And if they couldn't do that in the city, they certainly can't do it... But didn't you assume that you have to go to the meeting? Because I read the record, you weren't required to come to the meeting. That's why this whole policy is interesting. It doesn't seem to have much bite to it. And you're all about worrying about potential bite. Chilling, right? And if it doesn't have any bite, how can there be chilling? Am I right that you don't have to come to the meeting? The meeting is technically voluntary, Your Honor, but I don't... Well, do we have anything in the record that says it wasn't voluntary in some situation? I mean, technically, we've given it a little bit of a pejorative spin there. The meeting is voluntary, right? Yes. Yes, Your Honor. But if you place yourself in the shoes of an 18 or 19-year-old student at a university, and you get a letter from the dean of students asking you to meet about your speech, I imagine most 18 or 19-year-olds who are freshmen at a university would feel pretty obligated to go. And in Schlissel, the Sixth... Would you like me to come to a voluntary meeting about your speech? You have dealt with more docile 18 and 19-year-olds than I have. Well, Your Honor, I think the Sixth Circuit in Schlissel pointed out that the referral power that the bias response team had there... But I asked you about that earlier, too. I didn't think the referral power was any more than any other citizen could have or any other member of the community. Well, certainly anybody can report misconduct, but it's different when you're dealing with the state summoning you for your speech and referring you versus up here. The power dynamic is widely different. I see that my time is running out, so very quickly, just to touch on the informational activities policy. The university emphasizes that they have disclaimers about protecting students' First Amendment rights, but the Supreme Court said in U.S. v. Stevens that citizens are not required to rely on the noblesse oblige of the government to not restrict First Amendment activity when a policy facially does so. And lastly, I would just point out that Child Evangelism Center believed the court actually held that the form analysis is relevant. I have a question, sorry, before you sit down. So in the Eleventh Circuit case, the court, although it granted... it reversed on the standing issue, it remanded to the district court to consider the merits of the policy in the first instance. And I know you say that in this case it should be clear to us that you should win, but you're not arguing that simply because you would have made a showing on standing that that necessarily ends the inquiry, right? I mean, we could agree with you with respect to the standing question and send it back to the district court and the court could rule against you and find that at least on the merits there simply isn't a substantial enough chill to warrant a First Amendment violation. Is that right? There are definitely two different inquiries, Your Honor. That's correct. Isn't your standing argument tied to the whole chill? There is. If we find that there's insufficient evidence of chill, you have no standing. There is a substantial degree of overlap, Your Honor, yes, between objective chill. If the court finds that this policy objectively chills speech as a matter of law, then because it clearly, facially applies to protected speech, our position is that there's simply no way that could be held up on the merits, which is why the university doesn't really focus on it. So you answered the backwards of that, but that's fine. So if we should find that there is enough chill to get you standing, you win, is what you just said. That's essentially it. If you find there isn't enough chill to get you standing, you lose. Essentially, Your Honor. Yeah, okay. If Your Honor would accept nothing further. All right, thank you. Thank you, Your Honor. All right, we appreciate very much counsel's argument in this case. We will move directly into our second case.
judges: J. Harvie Wilkinson III, Albert Diaz, Diana Gribbon Motz